(No. 22862.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JULIUS REZNIK, Plaintiff in Error.

*Opinion filed June 14, 1935—Rehearing denied October 4, 1935.*

WM. SCOTT STEWART, for plaintiff in error.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, A. B. DENNIS, and J. J. NEIGER, (EDWARD E. WILSON, HENRY E. SEYFARTH, and JOHN T. GALLAGHER, of counsel,) for the People.

Mr. JUSTICE SHAW delivered the opinion of the court:

In 1924 Phillip Murphy, alias Phillip Mansfield, was convicted of robbery and sentenced to the Illinois State Penitentiary at Joliet, where he remained a prisoner until paroled in the fall of 1933. Shortly before he became eligible for parole he obtained the name of the defendant, Julius Reznik, an attorney in Chicago, from another prisoner in the penitentiary, and wrote Reznik a letter seeking to employ him in the matter of the intended application to the parole board. Reznik visited the prisoner at Joliet and also exchanged some letters with him. Eventually, in order to secure the parole, Reznik persuaded Abe Cohn, alias Graham Cogan, to write a letter to the parole board offering employment to the prisoner. Murphy (who will hereinafter be referred to as Mansfield, as in the abstract,) was paroled shortly before Christmas of 1933 and reported to Cohn (who will hereinafter be referred to as Cogan, as in the abstract,) at the latter's place of business in Chicago. This was a wholesale stationery business conducted under the name of "Graham Cogan Company," with fictitious names of officers on its letter-head, although there was no corporation or officers and the right name of the proprietor was Abe Cohn.

On January 31, 1934, John T. Allen and an assistant were held up and robbed of more than $1000 by Mansfield and Eddie Coyle. Part of the money taken in this robbery was in new one-dollar bills, the numbers of which were registered with the currency exchange, where they had just been obtained. Mansfield gave two of these dollar bills to his cousin, Frank Coyne, who was afterwards arrested when trying to pass one of them. Immediately after the crime the robbers divided the proceeds, $421 to Mansfield, $420 to Coyle, his fellow-robber, and $200 additional to Coyle to be given to the "tipster" who had pointed out the victim of the robbery. Mansfield then went

to his home, where he hid most of the money in a dresser drawer, went from there to Cogan's place of business and had his monthly report for the parole board signed by Cogan, and later in the same afternoon turned in the report to the office of the parole board in the Transportation building. For the robbery of Allen the police arrested Mansfield, his brother, Timothy J. Murphy, and his cousin, Frank J. Coyne. They were all indicted and placed on trial in the criminal court of Cook county, in which trial the defendant, Reznik, appeared as the attorney for Mansfield.

Mansfield's defense was an alibi, it being claimed by him that he was at Cogan's place of business on North LaSalle street at the time the robbery took place, several miles away. Upon the trial of his case he falsely testified that he had had nothing to do with the robbery but was at Cogan's place of business at the time, and that he had been at that place of business continuously between the hours of 9:30 in the morning and 2:00 o'clock in the afternoon. The robbery occurred at about 1:30 P. M. The witness Cogan, who was in court and heard the testimony of Mansfield, testified falsely to the same effect. The result of that trial in the criminal court was a finding of guilty as to Mansfield and also as to his cousin, Coyne, the finding as to Mansfield carrying with it a life sentence because of a count in the indictment charging his previous conviction of robbery. After the verdict, and before sentence, Mansfield told the presiding judge that his cousin was innocent and that he was guilty. The judge thereupon started an investigation of the defense that had been presented, which investigation resulted in the indictment of the defendant, Reznik, jointly with Mansfield, charging both of them with subornation of perjury, it being alleged that they had suborned Cogan to swear falsely as to the alibi. Upon trial of Reznik under this indictment he was found guilty of subornation of perjury, and it is to reverse a judgment on that verdict that this writ of error is sued out.

After Reznik's conviction the judge who had tried the case against Mansfield, Murphy and Coyne set aside the verdict in that case and granted a new trial. Coyne was found not guilty, the habitual criminal count was waived as to Mansfield and he was permitted to plead guilty to armed robbery, upon which plea he received an indeterminate sentence of from one year to life. At the same time an indictment against Cogan charging him with perjury was stricken from the docket with leave to re-instate, the indictment against Mansfield for subornation of perjury was stricken with leave to re-instate, and an indictment against Cogan and Mansfield charging conspiracy was stricken with leave to re-instate. Plaintiff in error contends that the result of the procedure up to date is that Mansfield has avoided a life sentence as an habitual criminal, thus rewarding him for his testimony against the defendant, and the witness Cogan has avoided the penalties for perjury and conspiracy as his reward in the same transaction.

For a reversal of the judgment against Reznik it is urged that the evidence is insufficient, that the court erred in the admission of certain testimony, and that the court further erred in the matter of instructions to the jury.

The error claimed to exist in regard to the admission of evidence is based largely upon the testimony of Mansfield, who was permitted, over objection of the defendant, to testify that Reznik procured and persuaded Mansfield to testify falsely in his own defense as to his whereabouts at the time of the alleged robbery. The indictment charged Reznik and Mansfield jointly with suborning the testimony of Cogan, and this evidence was therefore at variance with the charges in the indictment. It is further objected that this evidence tended to prove another and additional crime unrelated to the one for which the defendant was being tried. We will first consider the record as a whole, without reference to the admissibility of this particular evidence.

The fact that perjury was committed by Cogan and Mansfield in the latter's trial for robbery is not controverted on either side. It is urged in the People's brief that as to the subornation or procurement Cogan is neither a principal nor accomplice, for legally he cannot be said to be guilty of persuading himself to commit perjury, and that for this reason in the prosecution of the defendant for subornation of perjury the crime by him may be established by Cogan's uncorroborated testimony. It is admitted in the People's brief that there was no evidence directly corroborating Cogan.

Taking up first the testimony of Mansfield to the effect that his lawyer, Reznik, advised and persuaded him to testify falsely as to his alibi, we find it to be strangely at variance with his other acts and conduct. In order to Lelieve this to be true it would be necessary also to believe that he left the matter of his alibi to such fate as might befall it at the hands of Cogan, without any previous arrangements with Cogan as to what he would swear to and without any subsequent plans or conversations with him in respect thereto. It is entirely clear that he made careful and precise plans for the commission of the robbery, the procurement of the car to be used therein, the changing of the license plates thereon, the concealment of the money, the signing of his parole report and its subsequent filing with the parole agent. It is apparent that he and his fellow-robber, Coyle, foresaw and provided for everything that might be necessary to successfully accomplish their crime. Its execution was perfect and without flaw, and so was his defense, provided, only, that Cogan deliver the necessary testimony as to alibi. We are asked to believe that this very essential point was overlooked until the robber was faced with the actual necessity of going to trial, and then to further believe that this defense was for the first time conceived in the mind of his attorney, and that Mansfield only testified to it upon being urged and per-

suaded to do so by Reznik. This is incredible to persons of ordinary experience, and not only fails to convince us beyond a reasonable doubt, but, on the other hand, presents us with a very real and substantial doubt as to the truth of the statements made. It is to our minds more reasonable to believe that Mansfield planned his alibi as carefully as he did his crime. That he either knew, or had reason to believe, that Cogan would support his statement that he had been at work during the hour of the crime, and that the perjury which he was so willing to commit, and did commit, originated in his own mind and was committed in accordance with his own plans.

Considering the testimony of the witness Cogan, we find him admitting, on cross-examination, that he was in court and heard Mansfield testify; that he then falsely testified that he had been paying Mansfield a salary, contrary to the truth, and further, that Mansfield had worked regularly, likewise contrary to the truth. He admitted that he had made both of these false statements under oath merely "to help Mansfield out," and without any solicitation, suggestion or advice of the defendant, Reznik. Cogan testified that the first time he knew that Mansfield was charged with robbery was on the Saturday before he testified in the case, which was on March 22. This was more than a month after the robbery. At another point in his testimony he stated that a policeman had been out to his place of business two days after the robbery and inquired if Mansfield worked there; that he had told the policeman that Mansfield was out, and that the policeman then asked him if Mansfield had been there the day before; that he, Cogan, said that he was, and the policeman thereupon told him that he had Mansfield locked up during the day before and that he knew Cogan was lying. Cogan testified that he had told this lie to the policeman "just to help Mansfield out," and that Reznik had not told him to do that. At another point in his testimony he stated that he had

been to Reznik's office immediately after signing the parole sheet and had been informed by Reznik that Mansfield was. in trouble, although, as stated above, he had also testified that he did not know Mansfield was charged with robbery until the Saturday in March before the trial opened. A consideration of the testimony of these two witnesses discloses that neither of them is entitled to any credit.

The record is without any evidence from which we might even infer a motive for Reznik to persuade or induce either of the material witnesses to testify falsely. He testified in his own behalf that he handled the case in the usual way, presenting the testimony of his client and that of Cogan. He denied *in toto* any persuasion or advice as to Cogan's testimony. He testified that he had interviewed Cogan at Mansfield's request and that Cogan had told him his story; that Cogan remembered the signing of the parole report, and that he then remembered from that incident that Mansfield had been working all that day. Without commenting at length upon his testimony, it is sufficient to say that it appears to be entirely credible and is not contradicted on any material point except by the testimony of Mansfield and Cogan.

Enough has been said to indicate that this record presents a serious question of public policy, which may extend far beyond the immediate result of the present case. The conviction here depends entirely upon the testimony of two disreputable and discredited witnesses, both of them admittedly guilty of infamous crimes and in general unworthy of belief. Mansfield, twice convicted of armed robbery, bore the added stigma of perjury, and Cogan admitted the latter crime, which is the most damaging impairment that can be placed upon the credibility of any witness. Nor is this all. Mansfield had the most cogent and compelling reasons for testifying falsely. By reason of his prior conviction of robbery and the second conviction under which he then stood he faced the certainty of

life imprisonment. To evade this penalty he permitted two members of his own family to remain in jail more than two months, during which time he falsely denied his own guilt. He then unhesitatingly committed perjury, and persisted therein until the heaviest possible penalty had befallen him. Then, and not until then, when he had no possible loss to sustain thereby, did he admit his guilt. As a reward for his testimony against the defendant the extreme penalty has been lifted from him. The same reason applies to the witness Cogan. He faced the certainty of a long term in the penitentiary for perjury, and this punishment has been remitted immediately following his testimony against the defendant. Summing it up, one perjurer has been forgiven his just punishment, and another more vicious criminal—a twice-convicted robber and admitted perjurer—has been made eligible to parole after one year in order that the defendant be sent to jail and subjected to disbarment.

The testimony of the defendant is entitled to greater weight than that of either witness against him. As recently as 1927 he produced such evidence of good moral character that he was admitted to the bar of this State and accepted as an officer of this court. Nothing more is apparent to discredit his testimony than the evidence of two confessed criminals—perjurers both and both testifying under pressure to save themselves. The record makes it entirely clear that influence was used to obtain their testimony and that they were rewarded for it. Cogan admitted that after being questioned for hours he was permitted to go free as soon as he made the statement that Reznik had told him what to testify to. We doubt the wisdom of a policy so dangerous to the rights and liberties of all citizens in its eventual result as that shown by this record.

For the reasons indicated the judgment will be reversed.

*Judgment reversed.*